State of New York
Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 18
The People &c.,
      Respondent,
    v.
Andrew J. Regan,
      Appellant.

Matthew C. Hug, for appellant.
Matthew L. Peabody, for respondent.

WILSON, J.:

On the morning of August 9, 2009, a woman reported to the police that she had been raped a few hours earlier by someone she knew well, whom she identified to the police. That same day, she submitted to a sexual assault examination that included DNA samples. Also that day, the police questioned the named assailant—defendant herein—who denied any sexual contact with the woman and refused to provide a DNA sample. Defendant's

- 1 -

assertion could have been (and years later was) refuted by obtaining a sample of his DNA via a swab of his inner cheek.

Despite the above facts, the People took over four years to file an indictment. Because of the substantial delay—as to most of which the People offer no explanation whatsoever—the constitutional right to prompt prosecution, embodied in the due process clause of our state constitution, was violated. We must reverse.

I.

Four friends, consisting of two couples, attended a wedding and went out socializing together afterwards: defendant, Ms. B (defendant's girlfriend), the complainant, and Mr. P (the complainant's boyfriend). They eventually arrived at the complainant's home and went to sleep. As the complainant told the police a few hours after the sexual assault and testified at trial, she awoke to find defendant on top of her and he continued to rape her after she awoke. The complainant immediately told Mr. P what had happened; he confronted defendant and called a friend to come and remove defendant and Ms. B from the apartment.

When interviewed by the police that same day, defendant said that he and the complainant had not had sex at all but refused to provide the police with a DNA sample voluntarily. The police interviewed other witnesses and administered the sexual abuse evidence collection kit to the complainant on the day of the assault, August 9, 2009. Four days later they collected a DNA sample from Mr. P. Five months later, the lab reported that samples taken from the complainant's person and underwear contained semen; three months after that, the lab reported that male DNA from someone other than Mr. P was

present in the samples. By April 6, 2010, the People concluded that they needed to obtain a DNA sample from defendant—the same one the police asked him to provide when he was first interviewed the day of the assault. The police again asked defendant to provide a DNA sample voluntarily, but did not hear back from him and failed to follow up.

Approximately seven months later, the assigned assistant district attorney ("ADA") reached out to the New York Prosecutor's Training Institute for help figuring out how to get a warrant to collect defendant's DNA, but did not then apply for one. No explanation for that failure has been offered. Two months after that inquiry, the ADA met with the investigatory team to brainstorm ways to proceed and they again noted they needed DNA evidence to prosecute defendant. They had several more meetings about the need to get DNA evidence and how to obtain it over the course of February. Four months later, they checked in with the investigators and the investigators said they would get the DNA evidence.

Thereafter, an entire year passed, for which the People offer no explanation: at no point have the People provided any account of what happened between June 10, 2011, and June 26, 2012. On June 26, 2012 the ADA emailed defendant's attorney to ask if defendant would voluntarily provide a DNA sample. At that point—nearly three years after the sexual assault and nearly two-and-a-half years after the police knew that a man's DNA other than Mr. P's was on the complainant's underwear and person—defendant's attorney responded he had represented defendant on a case several years earlier, but not on any current matter. When the ADA informed him that she was inquiring about that still-open investigation, defendant's attorney observed that the case was "pretty well *Singer* dead"—

referring to our decision in *People v Singer* (44 NY2d 241 [1978]), concerning the due process right to a prompt prosecution.  Despite counsel's admonition that the case against defendant might be constitutionally infirm due to excessive delay, the People inexplicably waited another five months to request a warrant.  To keep the context and timeline in mind, the People did not seek a warrant for defendant's DNA until 38 months after the complainant identified defendant as her assailant and defendant denied having sex with her.

The process to obtain a warrant for a sample of defendant's DNA proved simple, though the People introduced unnecessary and more unexplained delay. A week after a new investigator was assigned to the case, he approached the District Attorney, who suggested that a warrant might be required because defendant had declined to provide DNA voluntarily.  The investigator did not rely on any prior information gleaned by the District Attorney's Office as to the means for obtaining a warrant.  Instead, the investigator called the New York State Police Counsel's Office, completed the two-page search warrant application and five-page supporting affidavit that same day and sent it to the District Attorney's Office for review.  The application sat in the District Attorney's Office for three weeks, until it was eventually submitted to the court on Friday, November 9.  The court approved it that same day, and a buccal swab was collected from defendant three days later. On February 4, 2013, the unidentified DNA from the 38-month-old sexual assault came back consistent with defendant's, disproving his claim that he and the complainant had not had sex.  Defendant was arrested nine days later and the People filed a criminal complaint on February 12.  The People then presented the case to the grand jury on August 15, 2013.

On August 29, 2013—more than four years after the complainant first told the authorities about defendant's assault—the People finally filed the indictment against defendant. Once the case entered the court system, it proceeded promptly.

Before trial, defendant moved to dismiss the accusatory instrument, contending that his due process right to prompt prosecution had been violated by the excessive preindictment delay (*see generally Singer*, 44 NY2d 241 [1978]; NY Const art I, § 6). County Court denied defendant's motion. At trial, defendant no longer claimed he did not have sexual contact with the complainant; instead, he claimed that she had led him into her bedroom and the two voluntarily had sex while both their partners were elsewhere in the apartment. Defendant was convicted upon a jury verdict of rape in the first degree (Penal Law § 130.35 [2]). The Appellate Division, as relevant here, affirmed the judgment in a split decision (196 AD3d 735 [3d Dept 2021]).[1] A dissenting Justice at the Appellate Division granted defendant permission to appeal the Appellate Division's order. We now reverse the Appellate Division's order.

II.

By statute and constitutional law, New York guarantees criminal defendants the right to a speedy trial and prompt prosecution (*see People v Staley*, 41 NY2d 789, 791;

---

[1] The Appellate Division also modified an order of County Court, entered August 14, 2018, denying defendant's motion to vacate the judgment pursuant to CPL 440.10, by remitting for a hearing on defendant's claims of actual innocence and ineffective assistance of counsel. Defendant does not appeal from that portion of the Appellate Division order. Furthermore, because we conclude the indictment must be dismissed on prompt prosecution grounds, we do not address the merits of any of defendant's other arguments.

*People v Vernace*, 96 NY2d 886, 887 [2001]; NY Const Art I, § 6; CPL § 30.20). "[T]he State due process requirement of a prompt prosecution is broader than . . . the Sixth Amendment . . . . [and] [i]n some respects the State rule is less rigid in its application than the right to due process recognized under the Federal Constitution" (*Singer*, 44 NY2d at 253). This Court has "long held that unreasonable delay in prosecuting a defendant constitutes a denial of due process of law," and that "[a]n untimely prosecution may be subject to dismissal even though, in the interim, defendant was not formally accused, restrained or incarcerated for the offense" (*see Singer*, 44 NY2d at 253 [internal quotation marks omitted]). "[T]his Court has never drawn a fine distinction between due process violations based on delay in commencing prosecution and speedy trial violations," and "the factors utilized to determine if a defendant's rights have been abridged are the same whether the right asserted is a speedy trial right or the due process right to prompt prosecution" (*People v Wiggins*, 31 NY3d 1, 12 [2018] [internal quotation marks omitted]). Those factors are:

> "(1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charge; (4) whether or not there has been an extended period of pretrial incarceration; and (5) whether or not there is any indication that the defense has been impaired by reason of the delay"

(*Wiggins*, 31 NY3d at 9-10, quoting *People v Taranovich*, 37 NY2d 442, 445 [1975]). " '[N]o one factor or combination of the factors . . . is necessarily decisive or determinative of the [prompt prosecution] claim, but rather the particular case must be considered in light of all the factors as they apply to it' " (*Wiggins*, 31 NY3d at 10, quoting *Taranovich*, 37 NY2d at 445).

Although the Court treats alleged due process violations based on preindictment delay and alleged speedy trial violations based on postindictment delay similarly, there are some relevant distinctions. We have repeatedly stated, in the context of preindictment delay, that "a determination made in good faith to defer commencement of the prosecution for further investigation or for other sufficient reasons, will not deprive the defendant of due process of law even though the delay may cause some prejudice to the defense" (*Singer*, 44 NY2d at 254; *see People v Decker*, 13 NY3d 12, 14 [2009]; *Vernace*, 96 NY2d at 888). "By contrast, in post-charge delay cases, the People's good faith determination to delay the defendant's trial cannot continue indefinitely, even if their proffered justification for the delay would otherwise excuse a reasonable period of delay" (*Wiggins*, 31 NY3d at 13). In other words, "[t]he People necessarily have wider discretion to delay commencement of prosecution for good faith, legitimate reasons than they do to delay a defendant's trial after charges have been filed, even for legitimate reasons and without acting in bad faith" (*id.* [emphasis omitted]).[2]

We therefore have excused lengthy periods of preindictment delay—far lengthier than the period at issue in this case—where the People have established good cause for the

---

[2] As is typical in cases of pre-indictment delay, "no accusatory instrument was filed" during the prolonged delay here (Singas, J., dissenting op at 21). However, defendant was "actually—although not formally—accused of the" rape in August of 2009 (see *Singer*, 44 NY2d at 252), when the police conducted what they described in their notes as a "suspect interview" with their sole suspect—defendant. The interview concluded with defendant telling the police that he "was not willing to cooperate with this investigation without conferring with an attorney," after which he retained one and had no further direct contact with the police or prosecution until they obtained his DNA via warrant more than three years later. It is thus clear that defendant was aware he was the target of an investigation.

delay (*see e.g. Decker*, 13 NY3d at 14-15; *Vernace*, 96 NY2d at 887-888). Nevertheless, the due process right to prompt prosecution is not meaningless. "[I]f commencement of the action has been delayed for a lengthy period, without good cause, the defendant may be entitled to a dismissal although there may be no showing of special prejudice" (*Singer*, 44 NY2d at 254). "The primary responsibility for assuring prompt prosecution rests with the prosecutors" (*Staley*, 41 NY2d at 793). Prosecutors may not needlessly delay without an "acceptable excuse or justification" (*id.*), and a sufficiently lengthy unexplained delay may require us to dismiss the indictment altogether.

A.

Applying the *Taranovich* factors to this case, the delay was considerable. Although "there is no specific length of time that automatically results in a due process violation," longer delays are more likely to inflict greater harms (*People v Johnson*, 39 NY3d 92, 97 [2022], citing *Taranovich*, 37 NY2d at 445-446; *see also People v Cousart*, 58 NY2d 62, 68 [1982] [citing *Singer* for the proposition that "a five-year delay prior to trial raises a presumption of prejudice"]). In *People v Staley*, we held that a "wholly unexplained 31-month delay" was an "extraordinary time-lapse" that "would, without question, be cause for dismissal of the indictment" even without any showing of prejudice (*see* 41 NY2d at 790-793). Even the People concede that the delay here was "excessive." The fact that the Legislature removed the statute of limitations does not change our analysis (*see* Singas, J., dissenting op at 19 n 7) and if anything heightens the need for constitutional vigilance (*see Singer*, 44 NY2d at 253 ["it cannot be assumed that the Statute of Limitations will adequately protect the defendant against the potential prejudice inherent in any delay, since

in this State there is no Statute of Limitations for (rape in the first degree)"]).  Under the most charitable interpretation of the record and our case law, the People cannot satisfactorily account for 31 months of their four-year delay.

The People's explanation of their conduct is, as both the People and the dissents concede, a factor that "weighs in the defendant's favor" (Singas, J., dissenting op at 22; 196 AD3d at 737 ["the preindictment delay of four years was lengthy and the reasons for the delay proffered by the People certainly left something to be desired"]).  "Generally when there has been a protracted delay, certainly over a period of years, the burden is on the prosecution to establish good cause" (*Singer*, 44 NY2d at 254; *Decker*, 13 NY3d at 14). It has not established good faith in this case.  Here, 24 months are wholly unexplained by the record or any of the People's papers in this matter and 7 months at a point late in the timeline are flimsily justified as necessary to decide the case required DNA evidence and then figure out how to get DNA evidence from defendant.  The People's own submissions demonstrate the emptiness of the claim that the police and the People did not know how to obtain defendant's DNA and could not have figured it out sooner: not only did the assigned ADA obtain guidance on the warrant process in November of 2010—two years before the People filed their ultimately successful warrant application—but the investigator who eventually prepared the warrant application managed to figure out the procedure in part of a day.  Indeed, our own case law dating back to at least 1982 provides the needed guidance on how to address this routine legal matter (*see Matter of Abe A.*, 56 NY2d 288 [1982]).

Even taking the People's explanation for their tardiness at face value, neither ignorance nor indolence can be asserted to vitiate the constitutional guarantee of a prompt

prosecution. As explained, a defendant will not be deprived of due process of law if the People make a good faith determination "to defer commencement of the prosecution for further investigation or *for other sufficient reasons*" (*Singer*, 44 NY2d at 254 [emphasis added]). The People may not do what they did here. Although they should have immediately concluded, as the police did, that they would need defendant's DNA, they explicitly decided that they would need defendant's DNA by April of 2010. They then waited, for no asserted or apparent reason, to delay seeking a warrant for that DNA until November of 2012. The People do not even argue that their delay represented a good faith, strategic decision that was backed by sufficient reasons. Rather, they concede that the delay was due to incompetence and demand credit for the fact that they did not intend to sabotage defendant's defense. The People's negligence is not, as they argue here, a neutral factor in evaluating a prompt prosecution claim: as the U.S. Supreme Court has noted, "[a]lthough negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide" (*Doggett v United States*, 505 US 647, 657 [1992]; *see also Wiggins*, 31 NY3d at 13 [citing this part of *Doggett* approvingly in the *Taranovich* context]; *Staley*, 41 NY2d 789, 792 ["(s)heer neglect or trifling . . . is not permissible"]).

*Singer* offers an instructive comparison. In *Singer*, we held a 42-month pre-indictment delay to be unacceptable where the police spent roughly four months gathering the evidence they would ultimately use at trial, but roughly two months later the People "directed that there be further [ultimately unsuccessful] investigation" (44 NY2d at 250 [internal quotation marks omitted]). For the following roughly two-and-a-half years, a

detective "kept a folder on [the defendant] and on occasion . . . d[id] some work on it," losing track of the defendant for a few months before arresting and charging him 42 months after the crime had been committed (*see id*. at 248 [internal quotation marks omitted]). Here, law enforcement gathered all the non-DNA evidence the People used at trial almost immediately.  The police immediately attempted to gather DNA from defendant but, faced with defendant's failure to provide a DNA sample voluntarily, the People took no appreciable steps to obtain that evidence until a new investigator—who did not rely on any of their previous research—did so within a few days.  Unlike in *Singer*, the People actually did obtain new, helpful evidence at the end of their search.  Also unlike in *Singer*, however, there is no indication that the People asked the police to seek new, unknown evidence that might strengthen their case.  They simply failed to employ readily available legal procedures, ultimately filing an indictment roughly 48 months after the crime.

Judge Singas misapplies the People's burden based on a reading of *Singer* that is not grounded in the Court's explanation of its holding.  In her account, "the Court emphasized consideration of the People's possible bad faith in delaying prosecution" (Singas, J., dissenting op at 24).  Although the *Singer* court noted that the People may have "had a legitimate reason" for the delay (namely, a strategy to question the defendant under "more favorable conditions"), it reiterated the well-settled principle that "the burden is on the *prosecution* to establish good cause," and "if commencement of the action has been delayed for a lengthy period, without good cause, the defendant may be entitled to a dismissal although there may be no showing of special prejudice" (*id.* at 254 [emphasis added]).  Nowhere did the *Singer* court mention bad faith or distinguish between the

positive presence of bad faith and the mere lack of good faith—it was only the dissent who used the term "bad faith," and only to comment that "there [wa]s no indication that this decision was made in bad faith" (*id*. at 258 [Gabrielli, J., dissenting in part]). Although "bad faith . . . obviously would weigh heavily in favor of dismissal of the indictment" (*People v Romeo*, 12 NY3d 51, 56-57 [2009]), we have never lightened the prosecution's burden to explain itself merely because the record does not establish the People's bad faith (*see* Singas, J., dissenting op at 23-25). As in *Singer*, the record and the briefing in this case are devoid of any explanation for the People's delay, although here the People had multiple opportunities to provide one.

By contrast, we are much more solicitous of the People when they offer even a colorable explanation for their delay, for instance when the witnesses are cowed by the defendant's threats (*see Decker*, 13 NY3d at 14; *Vernace*, 96 NY2d at 887).[3] Other acceptable reasons for pre-indictment delay relate to the People's "need to investigate to discover the offender, to eliminate unfounded charges, and to gather sufficient evidence prior to the commencement of a prosecution" (*People v Lesiuk*, 81 NY2d 485, 490 [1993],

---

[3] We do not "ignore[] this line of case law" (Singas, J., dissenting op at 22). Because our "analysis must be tailored to the facts of each case," (*Johnson*, 39 NY3d at 96), no one case dictates a result here. There are many salient differences between those two cases and this one, including different underlying offenses and—crucially—different explanations for the delay. Indeed, the different explanations offered in *Vernace* (*see* 96 NY2d at 887 [mob gunmen murdered two bartenders over a spilled drink in front of 25 patrons, none of whom said they saw the assailants and other witnesses either fled, hid or recanted, leading to the court's conclusion that the People, not the defendant, had been prejudiced by the delay]) and *Decker* (*see* 13 NY3d at 14 [the crucial witnesses had been intimidated by the defendant and were addicted to drugs and unwilling to testify for many years]) help explain why this case comes out differently than those two.

citing *Singer*, 44 NY2d at 254).  Judge Singas acknowledges that no such extenuating

factors are present here (*see* Singas, J., dissenting op at 23 ["The People lack a credible

justification for the . . . delay"]).

Indeed, Judge Singas goes so far as to propose that the delay arose from

"investigators' disbelief of [the complainant's] account of the incident, or their apathy

toward her trauma," or even their "enduring cultural attitudes towards sexual violence" (*id*.

at 25-26), but also maintains "that law enforcement proceeded with no bad faith" (*id*. at

24-25). Rather, those explanations would, in her dissent's view, "dilute[] the significance

of this factor" (*id*. at 25) because "[l]aw enforcement's mistreatment of an innocent victim,

or even bad faith toward a victim" (*id*. at 23 n 10) is not the kind of bad faith our laws

protect against.  We reject that analysis.

Turning to the remaining three *Taranovich* factors, they do not weigh in defendant's

favor, but they also do not overcome the People's sizeable, unexplained delay.  As we

recently noted in *People v Johnson*, the third factor refers to both the seriousness and the

complexity of the crime (*see* 39 NY3d, at 97).  Defendant was accused and ultimately

convicted of a heinous crime.  However, the preparation to which the People attribute a

delay for the prosecution of this particular crime was not complex.  The People had the

complainant's sworn statement and witness interviews immediately; the only missing

evidence was the DNA evidence from defendant, which could have been obtained with

speed and ease.   In saying this, we do not disregard the difficulties prosecutors may face

in "preparing a rape victim to testify," dealing with "the intricacies of DNA evidence and

analysis," or "confronting deeply entrenched preconceptions of rape held by juries and judges alike" (Singas, J., dissenting op at 19-20). If there were any evidence in the record that any of those difficulties contributed to the delay here, the outcome of this case might well be different. But the People have never contended, and there is no suggestion in the record, that the complainant in this case was reluctant to testify, or that investigators had any difficulty processing or interpreting the DNA evidence once it was finally collected. Nor do we hold that the six months between defendant's arrest and trial, during which the People presumably prepared the complainant to testify, was unreasonable. Rather, the procedure to obtain defendant's DNA was simple, and the People have not asserted that any delay in this case was caused by the intricacies of prosecution. The prosecution knew full well that, in determining the truth of defendant's assertion that he had no sexual contact with the complainant, DNA evidence could conclusively disprove his claim. Obtaining that proof took a day's worth of paperwork, a few days to execute the warrant, and three months to obtain the lab results. When a serious crime has been committed and there are no significant obstacles to prosecution, the interests of the People, the public, the victim, and the defendant all favor prompt prosecution.

As to the fourth factor, defendant was not incarcerated pretrial (*cf. Romeo*, 12 NY3d at 58 [concluding the fourth factor was "not significant in this case" involving postindictment delay because "(a)t no point during his prosecution on the Suffolk County charges has he faced additional incarceration from those charges"]).

As to the fifth factor, prejudice caused by the delay, defendant did not show special prejudice, but is not required to do so under our case law. We have repeatedly held that if

the first two factors favor defendant, establishment of prejudice is not required to find a due process violation (*see e.g.*, *Singer*, 44 NY2d at 254 ["if commencement of the action has been delayed for a lengthy period, without good cause, the defendant may be entitled to dismissal although there may be no showing of special prejudice"]; *Wiggins*, 31 NY3d at 13; *Taranovich*, 37 NY2d at 446-447 [the "traditional view in this court (is) that where in the circumstances delay is great enough there need be neither proof nor fact of prejudice to the defendant"]; *Staley*, 41 NY2d at 792 ["when the delay is long enough, the charges must be dismissed whether or not defendant's ability to present a defense has been shown to be hampered"]).   As we have said, the "impairment of one's defense is the most difficult form of [prompt prosecution] prejudice to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown' " (*Wiggins*, 31 NY3d at 18, quoting *Doggett v U.S.*, 505 US 647, 655 [1992]).   Therefore, we "generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify" (*Wiggins*, 31 NY3d at 18).

We recognize that "[t]he *Taranovich* framework is a holistic one—that is, 'no one factor or combination of the factors . . . is necessarily decisive or determinative of the [prompt prosecution] claim' " (*Johnson*, 39 NY3d at 96, quoting *Taranovich*, 37 NY2d at 445).   Although Judge Singas complains that we focus on just one *Taranovich* factor, the length of the delay (Singas, J., dissenting op at 26), that statement is truer of her dissent, which focuses on one component of the third factor: the gravity of the crime, allowing the seriousness of the offense to swamp all other factors.   She concedes the first two factors

favor defendant. Our precedent establishes that the absence of proof of the fifth does not overcome a lengthy unexplained delay, and the fourth factor is not implicated here. In contrast, she devotes most of her analysis to the seriousness of the offense (*see id.* at 3-12, 18-20, 26-28). She dismisses the relevance of cases solely on the basis that they involved less serious offenses (*see id.* at 22). Counterintuitively to her exposition of the systemic reluctance or indifference to prosecute sexual assault, she would permit greater unexplained prosecutorial laxity in rape cases than she would in burglary or robbery cases (and even where the other component of the third factor, the difficulty of the particular prosecution, cuts against the People). In this case, the balance of the factors weighs in favor of dismissal.

### B.

Although that prompt prosecution right formally belongs to defendant, it also vindicates the interests of victims and the rest of society by ensuring prompt adjudications and reinforcing society's expectation that crime will be taken seriously (*see Matter of Benjamin L.*, 92 NY2d 660, 667 [1999]; *Staley*, 41 NY2d at 792). Those considerations are particularly weighty in sexual assault cases, where, as our dissenting colleague so aptly chronicles in parts II and III of her dissent, distrust of the criminal justice system is rife, and regrettably, often justified.

Here, the complainant immediately reported the rape and identified defendant as her assailant. Defendant denied having sex with her. She submitted to an invasive search, and her boyfriend submitted to a DNA test. Thus, defendant's story could have been promptly

assessed by the simple measure of obtaining a warrant for his DNA.  Yet the People waited *more than three years* to obtain a warrant. We agree with Judge Singas's diagnosis of the still-pervasive problem of law enforcement's inability to recognize the seriousness of sexual assault: that problem manifests itself in "the premature ending of rape investigations, closing cases as based on 'unfounded' allegations, and devoting less time and resources to investigating such cases" (Singas, J., dissenting op at 26).  It results in "structural barriers that victims confront in pursuing sexual assault prosecutions" (*id*. at 26).  Indeed, those barriers are clearly reflected here by the People's inaction in response to the complainant's prompt report to the police that she had been raped by defendant.  That the People here cannot offer any explanation for 31 months of delay illustrates the reality of Judge Singas's spirited concern for the torpid prosecution of sexual assaults against women.

At oral argument, the People admitted that more than two years' of the delay was unexplained and inexplicable.  In keeping with their earlier explanation that they needed "to conclusively include or exclude the defendant as a suspect," the People explained the remaining delay in part by stating that the police had to "weigh" the conflicting testimonies—in essence, that this was a "he said, she said" case.  By implication, what "she said" did not provide the People with sufficient motivation to investigate her rape diligently—even when what "he said" could have been quickly disproved by a simple

investigative tool.[4]  An unexcused delay of over three years communicates to victims of sexual assault that their complaints will not be taken seriously.[5]   Although the constitutional guarantee of a prompt prosecution is not the sharpest instrument by which to address the chronic lackadaisical approach to reports of sexual assaults, affirming the prosecutorial conduct here would establish a precedent—which would apply in every future rape and sexual assault case—that the People can delay investigation of a serious crime for years without any explanation or excuse, with no constitutional consequence as long as defendant is unable to demonstrate a form of prejudice that, even when it exists, "can rarely be shown" (*see Wiggins*, 31 NY3d at 18).  Such a precedent would not aid defendants, future victims, or the public.

III.

Vacating any conviction on prompt prosecution grounds runs a genuine risk that a guilty person will not be punished, or, as in this case, not finish out his full sentence. However, vital societal interests can overcome that cost.  Our jurisprudence ensures that

---

[4] On the broader implications of this dynamic, *see generally* Eliza A. Lehner*, Rape Process Templates: A Hidden Cause of the Underreporting of Rape*, 29 Yale J L & Feminism 207, 232 (2017) (noting that "detectives shape the law of rape: by choosing which allegations to investigate, to investigate carefully, and to bring to prosecutors, they filter which rape allegations have a chance of making it to court and thus into case law … creat[ing] a cycle in which the more messy and contested cases do not advance through the criminal justice system, so prosecutors, judges and juries are not pushed to reconsider their assumptions about rape or about what a provable rape allegation is").

[5] *See* Lehner at 230 (explaining how the 'he said, she said' dynamic "reinforce[s] the behaviors in detectives that discourage victims from reporting or pursuing allegations of rape and signal disbelief to victims").

trials are fair and accurate; it also spurs prosecutors to take crime seriously and give all parties the prompt closure they need to move on with their lives. The message sent by Judge Singas's would-be resolution is unacceptable: that when prosecutors cannot tender any explanation, however fanciful, for years of delay in prosecuting a rape case, that delay does not matter.

The constitutional guarantee of a prompt prosecution places a burden on the state, when prosecuting crimes, to do so with alacrity. Contrary to Judge Singas's contention, we are not "impos[ing] a de facto 31-month limitation on first-degree rape investigations" (Singas, J., dissenting op at 26). The problem here is not simply the expanse of time between when the crime occurred and when defendant was charged, but the complete failure of the People to proffer any excuse which even colorably justifies that delay. Our constitution allows for modest unexcused delays; it allows for lengthy justifiable delays. But it does not allow for lengthy unexplained or, as here, inexplicable delays caused by lethargy or ignorance of basic prosecutorial procedures. The constitutional prompt prosecution guarantee benefits defendants, victims and society at large, and it is the role of the courts to protect it (*see Singer*, 44 NY2d at 254; *Matter of Benjamin L.*, 92 NY2d at 667). In this case, the police and prosecutors did not take defendant's constitutional rights or the complainant's sexual assault seriously; they did not act expeditiously with regard to either. Their delay violated defendant's constitutional right to a prompt prosecution.

Accordingly, the order of the Appellate Division should be reversed and the indictment dismissed.

SINGAS, J. (dissenting):

Despite years of progress by lawmakers and courts, including this Court, to dismantle unreasonable barriers to rape prosecutions, women who report sexual violence continue to face an uphill battle to hold those who rape them accountable. It is a harder

- 1 -

fight after today. With the majority decision, the scales, once again, weigh against women's voices. While the majority aims to punish the People for the pre-accusatory delay in securing DNA evidence—a delay that had no discernible impact on defendant's ability to defend himself—the result is a stunning nullification of a jury's first-degree rape conviction and the reinforcement of the bleak history of the treatment of sexual assault victims. Because there was no due process violation, today's decision serves only to undermine New York's recent gains in ensuring that sexual assault victims are treated fairly by the criminal justice system. Accordingly, I must dissent.

## I.

Defendant, convicted of the first-degree rape of an acquaintance, argues that the pre-indictment delay of four years violated his constitutional right to a speedy trial. The victim here promptly reported the rape and cooperated in the investigation. A jury found defendant guilty, and he was sentenced to twelve years' imprisonment. The Appellate Division, affirming the trial court's decision on the matter, determined that "no violation of defendant's constitutional right to a speedy trial" occurred (196 AD3d 735, 737 [3d Dept 2021]). The majority reverses this sound decision by means of an improper application of the well-settled balancing test determining due process violations, rationalizing the injustice to the victim by pointing to the People's "ignorance" and "indolence" in obtaining the relevant evidence (majority op at 9). In doing so, the majority discounts several salient factors, particularly the severity of the crime—first-degree rape—because "the police and prosecutors did not take . . . the victim's sexual assault seriously" or "act expeditiously" to vindicate her rights (majority op at 19). Today's holding has disturbing echoes of our

criminal justice system's past shameful treatment of sexual assault victims and reverses recent progress aimed at assisting victims in obtaining justice.

## II.

From its origins in common law, the crime of rape failed in purpose and effect to prioritize the violation on the bodily autonomy of its victims, mostly women. Introduced around the sixth century, chattel theory considered a woman first to be the property of her father, and later, if married, the property of her husband (Cassandra M. DeLaMothe, *Liberta Revisited: A Call to Repeal the Marital Exemption for All Sex Offenses in New York's Penal Law*, Fordham Urb LJ 857, 861 [1996]). Rape as a legal offense thus sought "to safeguard both the value of women to men and the stability of the marriage market" (*see* Alexandra Ward*, What's Rightfully Ours: Toward a Property Theory of Rape*, 30 Colum JL & Soc Probs 459, 488 [1997]), and was generally thought of "as a property crime of man against man" (Anne Dailey, *To Have and to Hold: The Marital Rape Exemption*, 99 Harv L Rev 1255, 1256 [1986] [internal quotation marks omitted]). Relatedly, the legal doctrine of coverture defined a married woman's legal existence as beginning and ending with her husband. Through coverture, a legal fiction was created in which a married woman's legal identity was subsumed by her husband's and the husband exercised expansive authority and control over his wife (1 William Blackstone, Commentaries on the Laws of England at 430 [John L. Wendell ed 1847]).[1]

---

[1] Derived from this property-centric lens, and rationalized on a theory of implied consent, the marital rape exemption sanctioned sexual violence within marriage, such that a man did not commit rape if he was married to his victim. As 17th century English jurist Sir Matthew Hale opined, "the husband can not be guilty of a rape committed by himself upon

That women and their privacy were the property of men pervaded our rape laws in other insidious ways.  For example, an evidentiary common law rule allowed evidence of a victim's sexual history to be admitted at trial for consideration on the question of her consent.  Such evidence was probative of consent, the theory went, because women who had previously consented to nonmarital sexual intercourse were considered to have a "character for unchastity," which made it more likely that the woman had consented to sexual intercourse on the occasion at issue (Abraham P. Ordover, *Admissibility of Patterns of Similar Sexual Conduct: The Unlamented Death of Character for Chastity*, 63 Cornell L Rev 90, 91 [1977]).  This rule encouraged juries to engage in value judgments regarding which women were worthy of protection under the law, and exploited societal perceptions of women who engaged in nonmarital sex as immoral.  The result was a system that offered less protection to women deemed less worthy of it (*see id.* at 98-99).

Stemming from these dehumanizing origins of rape in the common law, rhetoric relating to rape prosecutions quickly honed in on unsubstantiated concerns about false rape accusations.  Hale famously wrote that "rape is an accusation easy to be made, hard to be proved and harder to be defended by the party accused though ever so innocent," setting off centuries of policies and legal theories designed to shield men from accusations, and accountability, and leave their victims without recourse (1 Matthew Hale, The History of the Pleas of the Crown 635 [1736]).

---

his lawful wife, for by their mutual matrimonial consent and contract the wife hath given herself in this kind unto her husband which she can not retract" (Sandra L. Ryder and Sheryl A. Kuzmenka, *Legal Rape: The Marital Rape Exemption,* 24 J Marshall L Rev 393 [1991]; *see People v Liberta*, 64 NY2d 152, 162 [1984]).

Given this legacy of suspicion, it is of no surprise that rape prosecutions were encumbered by the corroboration requirement.  Prior to 1974, the Penal Law provided that "[n]o conviction can be had for rape or defilement upon the testimony or the female defiled, unsupported by other evidence" (former Penal Law § 130.15; *People v Croes*, 285 NY 279, 281 [1941]).  Victim testimony alone was insufficient to sustain a conviction, and additional evidence was required to establish both that the victim had been raped and that the accused was responsible (*People v Downs*, 236 NY 306, 308 [1923]).  Thus, as a matter of statutory law, the testimony of rape victims was treated as less credible than that of witnesses to other crimes, such as robberies or assaults.

The corroboration requirement was promulgated "to protect against the perceived danger of false accusations" and "nurtured . . . largely in an unfair skepticism of the testimony of the women who were the victims of these crimes" (*People v Fuller*, 50 NY2d 628, 635 [1980]).  "The original justification for the corroboration requirement in sex offense cases lies in the chauvinistic argument that women are prone to sexual fantasies and given to 'contriving false charges of sexual offenses by men' " (*People v Grady*, 98 Misc 2d 473, 475 [Albany County Ct 1979]; *see e.g. People v Yannucci*, 258 App Div 171, 172 [2d Dept 1939] ["(t)he law wisely recognizes that some complainants are designing or vicious.  If it were not for the rule of corroboration, a defendant would be at the mercy of an untruthful, dishonest or vicious complainant"]).  Because of the nature of the crime, often all victims have is their word and, by statutory design, their word was not good enough, rendering convictions elusive in all cases but those with the most overwhelming evidence.

Even when corroborative evidence was available, courts frequently discounted its value and held that such evidence did not satisfy the requirement. For example, in *People v Radunovic*, this Court held that bruises on the victim's thigh, as well as testimony from her obstetrician that her hymen was intact prior to the alleged assault and broken after, did not constitute sufficient corroboration (21 NY2d 186 [1967]). In another instance, a court considered a defendant's admission to having had sexual intercourse with the victim over the course of two years to fall short of corroborating the allegation of statutory rape (*see People v Perez*, 25 AD2d 859 [2d Dept 1966]; *see also People v Downs*, 236 NY 306, 311-312 [1923] [admission by defendant that he had "fooled with" the victim did not satisfy the corroboration requirement]). A victim's pregnancy, claimed to be the result of the rape, was also not sufficient to satisfy the corroboration requirement (*Croes*, 285 NY at 282).[2]

Another unduly restrictive requirement imposed upon victims, grounded in the same skepticism as to their credibility, was the common law "hue and cry" requirement, which demanded immediate outcry (Dawn M. DuBois, *A Matter of Time: Evidence of a Victim's Prompt Complaint in New York*, 53 Brook L Rev 1087, 1089 [1988]). Without prompt reporting, prosecutors were precluded from even charging the crime (Michelle J. Anderson, *The Legacy of the Prompt Complaint Requirement, Corroboration Requirement, and*

---

[2] In response, prosecutors often pursued only lesser charges, such as attempted rape, even where a completed rape had occurred (*see* William E. Nelson, *Criminality and Sexual Morality in New York, 1920-1980*, 5 Yale JL & Human 265, 305-306 [1993]). Courts reacted to this tactic by extending the corroboration requirement to lesser sexual offenses so that prosecutors could not "circumvent the requirement of corroboration necessary for a conviction of . . . rape simply by charging instead [a lesser offense]" (*People v Lo Verde*, 7 NY2d 114, 116 [1959]; *see also Radunovic*, 21 NY2d at 189; *People v English*, 16 NY2d 719, 720 [1965]).

*Cautionary Instructions on Campus Sexual Assault*, 84 BU L Rev 945, 955 [2004]; DuBois

at 1089).  Rape was again treated as a different class of offense based on a patriarchal view

of how women should behave: "[t]he rule is founded upon the laws of human nature, which

induce a female thus outraged to complain at the first opportunity.  Such is the natural

impulse of an honest female" (*Higgins v People*, 58 NY 377, 379 [1874]).  In the 1800s,

the rule was modified to allow prosecution despite the absence of immediate reporting, but

juries were entitled to make an adverse inference to the rape claim (DuBois at 1090).

Perhaps the most oppressive and dangerous requirement of all was that of "utmost

resistance," requiring a victim to have exerted "the greatest effort of which she is capable

therein, to foil the pursuer and preserve the sanctity of her person" for such rape to qualify

as a legal offense (*People v Dohring*, 59 NY 374, 383 [1874]).

> "Certainly, if a female, apprehending the purpose of a man to
> be that of having carnal knowledge of her person, and
> remaining conscious, does not use all her own powers of
> resistance and defence, and all her powers of calling others to
> her aid, and does yield before being overcome by greater force,
> or by fear, or being surrounded by hostile numbers, a jury may
> infer that, at some time in the course of the act, it was not
> against her will" (*id.*).

Thus, a woman who failed to resist risked an unsuccessful prosecution and one who did

resist potentially risked her life (*see* Letter of Assembly Sponsor in support, Bill Jacket, L

1982, ch 560 at 3-4 [in supporting legislation eliminating the proof-of-resistance

requirement, stressing that "many law enforcement officials and rape crisis services advise

women not to resist a sex attacker, as to do so is likely to place them in danger of serious

injury or death"]).

"As such, rape was one of the few crimes for which the actions of the defendant alone were insufficient to satisfy the elements of the crime . . . .  Both the quantity and the quality of [the victim's] response were put on trial, deliberated over, and adjudicated" (I. Bennett Capers, *Real Women, Real Rape*, 60 UCLA L Rev 826, 383 [2013]), resulting in fewer convictions and traumatized victims as forsaken causalities.

### III.

Primarily since the 1970s, New York has significantly, albeit incrementally, recognized and acted to alleviate this extensive anti-victim bias.  In 1974, the legislature repealed former Penal Law § 130.15, requiring corroboration of the victim's account to obtain a conviction for forcible rape.[3]

One year later, the legislature enacted CPL 60.42, commonly referred to as New York's "rape shield" statute, precluding most evidence of a complainant's prior sexual conduct in a prosecution for a "sex offense" (or an attempt thereof).  The statute represents the legislature's determination that evidence of a victim's past sex life is "seldom . . . relevant to the issues of the victim's consent or credibility, but serves only to harass the alleged victim and confuse the jurors.  Focusing upon the immaterial issue of a victim's chastity tends to demean the witness, discourages the prosecution of meritorious cases, and leads to acquittals of guilty defendants" (Assembly Introducer's Mem in Support, Bill Jacket, L 1975, ch 230 at 4).  Indeed, "even with the [elimination] of the corroboration rule,

---

[3] Currently, corroboration is required only where lack of consent "results solely from incapacity to consent because of the victim's mental defect, or mental incapacity" (Penal Law § 130.16).

rape victims ha[d] still been reluctant to pursue prosecution of their attackers because they would not or could not undertake the risk of suffering the indignities attendant upon their cross examination"; the rape shield litigation, therefore, "accomplish[ed] two desirable objectives: It remove[d] from the trial of an alleged rapist the mini-trial of his alleged victim; and equally if not more important, it [would] encourage rape victims to cooperate wholeheartedly in the search for and prosecution of their attackers" (Mem of Morton H. Grusky, NY St Div of Criminal Justice Services, Bill Jacket, L 1975, ch 230 at 14).

In the late 1970s and early 1980s, the legislature repeatedly amended the definition of forcible compulsion contained in Penal Law § 130.00 (8), each time attempting to eliminate the prior version's perceived burden on the victim of a sex offense to fight off an attacker. The 1982 amendment eliminated any requirement of victim resistance, which "ma[d]e a long overdue public policy statement that submission to a sexual attack to preserve one's life or safety is not consent to a sex crime" (Legislative Mem in Support, Bill Jacket, L 1982, ch 560 at 8). But the revised definition continued to focus on the victim's subjective view regarding the degree of fear necessary to overcome their resistance to the assault, and relatedly to suggest that the offender's use of physical force was not alone sufficient to constitute forcible compulsion. Therefore, in 1983 the legislature amended the definition yet again to clarify that compulsion may take the form of physical force (Penal Law § 130.00 [8] [a]), as opposed to deadly physical force, or of a "threat, express or implied," which placed a person in fear "of immediate death" or of only "physical injury to himself, herself or another person, or in fear that he, she or another person will immediately be kidnapped" (Penal Law § 130.00 [8] [b]).

This evolving understanding of the crime of rape and its impact on victims was further reflected in *People v Taylor*, where the Court held that expert testimony as to rape trauma syndrome could be admitted to aid a jury in reaching a verdict (75 NY2d 277, 288-289 [1990]).  In so deciding, the Court effectively catalogued the long-standing institutional and societal obstacles to rape prosecutions outlined above: "rape is a crime that is permeated by misconceptions," and "jurors will under certain circumstances blame the victim for the attack," "refuse to convict the man accused," or "infer consent where the victim has engaged in certain types of behavior prior to the incident" (*id.*).[4]

Most relevant here, the legislature in 2006 took the extraordinary measure of eliminating the statute of limitations for prosecutions of rape in the first degree, criminal sexual act in the first degree, aggravated sexual abuse in the first degree and course of sexual conduct against a child in the first degree (*see* CPL 30.10 [2] [a]).  The legislature deemed sex crimes among "the most heinous and deeply disturbing in our society" and asserted that those who commit such "violent and serious acts should not be shielded from prosecution by the mere passage of time, especially at the expense of those whom they have victimized, and whose physical and emotional scars will endure without limitation" (Senate Introducer's Mem in Support, Bill Jacket, L 2006, ch 3 at 4).  Further, the legislature recognized "that offenders who commit these felonies often cause lasting harm, not only to victims and their families, but also to society and our system of justice," and

_____

[4] Relatedly, the Court had finally declared the "marital exemption" unconstitutional six years before, recognizing that "there is no rational basis for distinguishing between marital rape and nonmarital rape," and "[a] married woman has the same right to control her own body as does an unmarried woman" (*Liberta*, 64 NY2d at 163-164).

"our laws must be strengthened to provide clear recognition of . . . the compelling importance of prosecuting serious offenders, regardless of when law enforcement is able to proceed" (*id.*).[5]

In 2019, the legislature extended the statute of limitations for second- and third-degree rape prosecutions to twenty and ten years, respectively (CPL 30.10 [2] [a-1], [a-2]). The legislature asserted that, "[f]or crimes of sexual violence in particular, the [statute of limitations] clock ticks against the trauma and culture of silence that prevents victims from speaking out" (Senate Introducer's Mem in Support, Bill Jacket, L 2019, ch 315 at 5).

But while some barriers have been removed, sexual assault remains prevalent. In the United States, one in four women experience a completed or attempted rape at some point in her life (*The National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Sexual Violence*, https://www.cdc.gov/violenceprevention/pdf/nisvs/ nisvsReportonSexualViolence.pdf [Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, 3, last accessed March 3, 2023]) and eight out of

---

[5] Prior to its passage in the Senate, multiple senators rose in support of the legislation, asserting, variously, that the prior existing five-year statute of limitations for these crimes was "ridiculous, insensitive, and really obscene" (Senate Debate Minutes [6-21-06], at 5377); that "there is no justice for that woman" and the perpetrator "ha[s] gone unpunished" if the perpetrator was found after the five years had passed (*id.* at 5377-5378); that by assigning these crimes a five-year limitations period, "we were telling [women] that the crime of rape is not as serious as the crime of murder, the crime of kidnapping, the crime of arson and certain drug crimes" (*id.* at 5385-5386); that, by eliminating the statute of limitations, "[t]here is no place you can hide, there is no time frame in which you can avoid punishment" (*id.* at 5394); and finally and most fundamentally that "[r]ape is a woman's greatest fear. It is the one time we are rendered completely unable to protect ourselves," and victims should have "the opportunity to seek justice, whether it was one year, five years, 10 years, or 50 years" (*id.* at 5396).

every ten rapes are committed by someone known to the victim (*Perpetrators of Sexual Violence: Statistics*, https://www.rainn.org/statistics/perpetrators-sexual-violence [Rape, Abuse & Incest National Network, last accessed March 3, 2023]). Nor has the historically unfair treatment of rape victims been adequately addressed, as reflected by continued reticence to report the crime. In 2021, approximately 21 percent of rapes were reported to police, compared to 60 percent of robberies and 46 percent of assaults (Alexandra Thompson and Susannah N. Tapp, *Criminal Victimization, 2021*, https://bjs.ojp.gov/content/pub/pdf/cv21.pdf [U.S. Dept of Justice, 5, Sept. 2022, accessed March 3, 2023]). One figure estimates only five percent of reported rapes lead to arrest (*The Vast Majority of Perpetrators Will Not Go to Jail or Prison*, https://www.rainn.org/statistics/criminal-justice-system [Rape, Abuse & Incest National Network, last accessed March 3, 2023]). And less than six percent of all forcible rapes result in conviction (Kimberly A. Lonsway and Joanne Archambault, *The "Justice Gap" for Sexual Assault Cases: Future Directions for Research and Reform*, 18 Violence Against Women 145, 157 [2012]).

It is within this historical context that A.L. promptly reported that defendant raped her to the police, and it is against this backdrop that the majority denies her justice here.

IV.

After attending a wedding together on August 8, 2009, A.L. and her boyfriend C.P. spent time with A.L.'s best friend J.D. and her boyfriend, defendant. The group spent the evening out socializing and later that night, returned to A.L.'s house. A.L. offered to let J.D. and defendant sleep on the couch in her living room to avoid driving home. A.L. then

went to her room, told C.P. she loved him, wished him a good night, and quickly fell asleep. She woke up suddenly unable to breathe with a crushing weight bearing down on her body. She saw defendant's face above her own, felt his stomach touching hers, and then felt him roll off of her body. A.L. put her hands between her legs and felt something wet, her vagina swollen, and her underwear pushed off to the side.

Immediately, A.L. changed and found C.P., who was out on the porch making a call. Crying, A.L. told C.P. that she thought defendant had just raped her. C.P. began crying too and called his friend W.W., asking him to come over right away to get defendant out of the house. W.W. called A.L.'s parents. While A.L. was waiting for her parents, J.D. came to her and asked her what had happened. A.L. told her best friend that she thought defendant had just raped her. J.D. started yelling at A.L. and W.W. had to remove J.D. from the room. W.W. drove defendant and J.D. home; on the way, defendant told W.W. that he did not have sex with A.L. Soon, A.L.'s parents arrived, called the police, and drove A.L. and C.P. to the hospital, where a Sexual Assault Nurse Examiner (SANE) completed a sexual assault examination and rape kit, including swabs of A.L.'s vaginal and anal area. A.L.'s underwear was given to the SANE nurse at the hospital and police interviewed A.L. and C.P. Having reported the rape immediately and cooperated fully with police investigative procedures, including undergoing an invasive medical examination, A.L. had every expectation that law enforcement would promptly commence a prosecution.

That morning, the police also interviewed defendant, who denied having sexual intercourse with A.L., but told police that he wished he had. Four days later, police obtained a buccal swab from the victim's boyfriend, C.P., for comparison in subsequent

DNA testing.  On January 20, 2010, an investigator received a laboratory report indicating a positive presence for sperm on A.L.'s underwear and her vaginal and anal swabs.  That same day, at the request of the lab, police collected a buccal swab from A.L. for comparison.  On April 5, 2010, the investigator received a supplemental report reflecting that DNA recovered from the swabs comprised a mixture which included DNA from C.P. and DNA from an unknown male.  This date begins the pre-accusatory delay at issue in this case.[6]

In the ensuing 14 months, the People made nominal additional efforts to obtain defendant's DNA by consent and discussed the possibility of obtaining a search warrant. On April 6, 2010, the investigator conferred with the District Attorney and reached out to defendant's retained counsel to request that defendant voluntarily provide a DNA sample. There is no indication in the record whether the attorney responded to this request.  During that period, the DA's office rejected the possibility of proceeding by felony complaint without defendant's DNA sample because of the "relative lack of evidence."  In November 2010, the People discussed acquiring defendant's DNA with the New York Prosecutor's Training Institute.  In June 2011, an assistant district attorney met with the investigator to discuss the case.  Later that month, the investigator interviewed W.W, who stated that the night of the incident, defendant denied having sex with A.L.  In June 2012, the DA's Office contacted defendant's attorney regarding defendant's DNA sample or setting up a meeting with defendant and investigators.  Defendant's attorney responded that he needed more

---

[6] Indeed, the DNA testing and analysis was necessarily at the center of the investigation given defendant's initial lie that he did not have sex with A.L.

time to speak with defendant. On October 18, 2012, the DA and a new investigator agreed to seek a search warrant to compel defendant to provide a DNA sample. After receiving guidance from the New York State Police Counsel's Office regarding search warrant applications, on November 9, 2012, 31 months after the report indicating a mixture of DNA, the application was submitted and signed by St. Lawrence County Court. A DNA sample was collected from defendant and submitted to the State Police lab the same day. This action marks the end of the relevant pre-accusatory delay.

On February 4, 2013, the investigator received another supplemental report indicating that defendant's DNA matched the sperm found on A.L.'s underwear and swabs. A felony complaint was filed on February 12, 2013, commencing this criminal action. Defendant was subsequently arrested and arraigned. Between August 8, 2009, and the collection of defendant's DNA, law enforcement had minimal contact with defendant or his attorney. Prior to the filing of the accusatory instrument, there was no public accusation against defendant; no "perp walk" was conducted, no press conferences were held, and no media attention was sought or received.

The case was then presented to a grand jury and defendant was indicted on one count of rape in the first degree based on the victim's physical helplessness. Defendant moved to dismiss the indictment on preindictment delay grounds. The court denied defendant's motion, finding "the seriousness of the charge and the absence of any demonstrated prejudice to be paramount factors." The case proceeded to trial where defendant, confronted by the DNA evidence, admitted for the first time that he had sex with A.L. but claimed it was consensual. The jury ultimately found defendant guilty of first-degree rape.

The Appellate Division, with two Justices dissenting, affirmed defendant's judgment of conviction.  As relevant here, the Court upheld the denial of defendant's motion to dismiss, concluding that "the seriousness of the offense, the fact that defendant was not incarcerated pretrial and the absence of any demonstrated prejudice outweighed the four-year delay and the shortcomings in the People's reasons therefor" (196 AD3d at 737).

V.

New York's prompt prosecution framework has roots in Supreme Court precedent which sought to promote the Sixth Amendment's speedy trial "safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend [themself]" (*People v Ewell*, 383 US 116, 120 [1966]).  The New York Constitution's recognition that an extended delay before filing an accusatory instrument might violate a defendant's due process rights is an important check on the People's ability to unjustifiably delay a criminal prosecution to a defendant's detriment.  "[A] suspect's primary protection against protracted delay in being brought to bar ordinarily is the [s]tatute of [l]imitations, but delay in arresting or lodging charges over a lesser period of time may, in special circumstances, impair the right to a fair trial" (*People v Fuller*, 57 NY2d 152, 159 [1982]).  When "extreme and unjustified," and under "certain unusual circumstances," preindictment delay may "mandate dismissal of an indictment upon due process grounds" (*Vega v Bell*, 47 NY2d 543, 550 n 1 [1979]).

"[T]here are no clear cut answers in such an inquiry, and the trial court must engage in a sensitive weighing process of the diversified factors present in the particular case" (*People v Taranovich*, 37 NY2d 442, 445 [1975]).  Although several factors are of consequence, "no one factor or combination of the factors set forth below is necessarily decisive or determinative . . . but rather the particular case must be considered in light of all the factors as they apply to it": "(1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charge; (4) whether . . . there has been an extended period of pretrial incarceration; and (5) whether . . . there is any indication that the defense has been impaired by reason of the delay" (*id.*; *see People v Vernace*, 96 NY2d 886, 887 [2001]).

The goal of every balancing process should be "[t]o accommodate the sound administration of justice to the rights of the defendant to a fair trial" which "will necessarily involve a delicate judgment based on the circumstances of each case" (*United States v Marion*, 404 US 307, 325 [1971]).  The nuanced analysis in which courts must engage is thus not oriented toward punishing the People for failing to promptly commence a prosecution.  Nonetheless, the majority here concludes that defendant's due process rights were violated due to the delay in prosecution, either because law enforcement did not believe the victim, was slow in proceeding, or was negligent in its ignorance of the mechanisms to obtain a warrant. The majority casts aside this jury verdict without evidence that defendant suffered actual prejudice from the delay and where the only contact defendant had with law enforcement before his DNA was collected occurred the morning after the crime.

A proper balancing of the relevant factors yields a different result.

***Nature of the charges*:** There is a profound societal interest in ensuring that prosecutions of the most serious harms go forward, as evidenced by the legislature's elimination of the statute of limitations on serious crimes. When a crime is more serious, a greater delay prior to filing an accusatory instrument is tolerated. Accordingly, the more grievous the underlying crime, the less likely that dismissal is an appropriate sanction for an unjustifiable delay in the absence of prejudice.

When the New York Legislature repealed the five-year statute of limitations for first-degree rape in 2006, it explained that

> "offenders who commit violent and serious acts should not be shielded from prosecution by the mere passage of time, especially at the expense of those whom they have victimized, and whose physical and emotional scars will endure without limitation . . . . New York law recognize[s] that offenders who commit these felonies often cause lasting harm, not only to victims and their families, but also to society and our system of justice. [O]ur laws must be strengthened to provide clear recognition of the gravity of other violent crimes and the compelling importance of prosecuting serious offenders, regardless of when law enforcement is able to proceed" (Senate Introducer's Mem in Support, Bill Jacket, L 2006, ch 3 at 4).

It also referred to first-degree rape and similar sex crimes as "the most heinous and deeply disturbing in our society" (*id.*). In repealing the five-year statute of limitations for

rape prosecutions, the legislature mandated that rape be treated as seriously as murder, a crime likewise unencumbered.[7]

Indeed, murder investigations are comparable to rape investigations not only in gravity but in the likelihood of traumatized witnesses and DNA evidence, and in particular DNA mixtures (*see e.g. People v Decker*, 13 NY3d 12, 15 [2009] [noting "the witnesses' fear of testifying against defendant" in a murder prosecution]; *Vernace*, 96 NY2d at 887 [observing that a previously-cooperating witness in a murder investigation recanted out of fear of the suspects]; *see also e.g. People v Wakefield*, 38 NY3d 367, 371-372 [2022] [DNA sample collected from the murder weapon was not "compared to defendant's DNA profile because of the complexity of the mixture"]; *People v John*, 27 NY3d 294, 312 [2016] [generally noting the "more complex interpretation of DNA profiles from mixtures"]). Because, as this Court has recognized, investigations into such serious crimes require "more caution and deliberation" than investigations into lesser offenses (*Taranovich*, 37 NY2d at 446), this factor militates heavily against defendant.

The majority's assumption that a first-degree rape case with a cooperative victim is actually quite simple blithely ignores the devastating impact of sexual violence on a victim (*see* majority op at 14). There is nothing simple about preparing a rape victim to testify, in open court and under cross-examination, especially in cases involving physically helpless victims who are raped by acquaintances. Suggesting otherwise contradicts our modern

---

[7] The majority misapprehends the significance to the *Taranovich* analysis of the legislature eliminating the statute of limitations (majority op at 8-9). Indisputably, its elimination heightened the severity of defendant's crime.

understanding of victims' re-traumatization through participation in legal proceedings, where "[v]ictims are often subjected to detailed and aggressive questioning about personal and often traumatic events, and defense attorneys may try to apportion blame for the crime or question their credibility and reliability" (Jim Parsons and Tiffany Bergin, *The Impact of Criminal Justice Involvement*, 23 J. Traumatic Stress 182, 184 [2010]; *see also* Rachel J. Wechsler, *Victims As Instruments*, 97 Wash L Rev 507, 535 [2022]).   Indeed, "[r]esearchers have found that facing the perpetrator in court" and "remembering details of the crime . . . can all trigger secondary responses to the initial trauma"] (*id.*).  Characterizing this prosecution as "not complex" also disregards the intricacies of DNA evidence and mixture analysis, as well as the difficulties in confronting deeply entrenched preconceptions of rape held by juries and judges alike (*see* majority op at 13).

**Pre-indictment incarceration**: There was no incarceration prior to the filing of the accusatory instrument here, which certainly militates against dismissal.

**Prejudice**:  There has been no showing of specific prejudice.  While the delay is significant, it is not so long that substantial prejudice to defendant's ability to defend himself can be readily inferred (*see Decker*, 13 NY3d at 15-16 [in a murder case, significant prejudice could not be inferred from 15-year delay]).  In fact, the passage of time, without more, often works as much to the People's disadvantage as to the defendant's (*see id.* at 16; *Vernace*, 96 NY2d at 888 ["(f)ar from giving the People an unfair tactical advantage, the delay here has made the case against defendant more difficult to prove beyond a

reasonable doubt"]).[8]  In addition, "[u]ntil [arrest], a citizen suffers no restraints on [their] liberty and is not the subject of public accusation: [their] situation does not compare with that of a defendant who has been arrested and held to answer" (*Marion*, 404 US at 321). Critically, while defendant knew that A.L. had accused him of rape, no accusatory instrument was filed prior to defendant's arrest (*cf. People v Staley*, 41 NY2d 789 [1977]), and "[s]ince he was not arrested during the initial investigation, [defendant] was not subject to the anguish or public opprobrium often surrounding pending charges" (*Decker*, 13 NY3d at 15; *see Marion*, 404 US at 320-321).

For the entire pre-arrest period, defendant "enjoyed significant freedom with no public suspicion attendant upon an untried accusation of crime" (*Vernace*, 96 NY2d at 888 [declining to dismiss despite 17-year delay in murder case where there was no pretrial incarceration and no impairment or prejudice to the defense]).  After being initially interviewed by police, defendant had no contact with them for over three years.  Far from being the object of public ire and constant stress, defendant was free to live his life to the point where defendant's attorney barely recalled the case when he was contacted a second time to secure the DNA sample.  Moreover, because defendant was immediately made aware of A.L.'s rape accusation, defendant could retain any evidence or interview any witnesses (*see Barker v Wingo*, 407 US 514, 532 [1972] [in considering prejudice to the defendant, "the most serious" defense interest "which the speedy trial right was designed

---

[8] For example, by the time of trial, A.L. and C.P. had broken up, creating a risk that C.P. might not be willing to testify, and J.D., A.L.'s former best friend, and defendant were married.

to protect" is "to limit the possibility that the defense will be impaired" such as through loss of memory or witness disappearance]).  Thus, "the record does not demonstrate undue prejudice to the defense" (*id.*).

Given the speculative basis for finding that any prejudice occurred here, this factor also militates against dismissal.

***Extent of the Delay***:  As the majority has acknowledged, the relevant delay here is 31 months, not four years, as measured between law enforcement's receipt of the second supplemental biological sciences report on April 5, 2010, indicating a mixture of DNA including that of an unknown male, and submission of the *Abe A.* warrant application for defendant's DNA on November 9, 2012.  Plainly, this delay was considerable and weighs in defendant's favor.  But it is far from dispositive (*see Decker*, 13 NY3d at 15; *People v Wiggins*, 31 NY3d 1, 11 [2018] [internal quotation marks omitted] [six-year postindictment delay in murder prosecution, during which defendant was incarcerated, was "extraordinary" but "not in itself decisive"]).  Because of the severity of the crime, any delay here must be assessed in the same manner as delays in murder prosecutions, in which far greater delays have been tolerated (*see id.*; *Decker*, 13 NY3d at 15 [15-year preindictment delay in murder investigation was "substantial" but not dispositive]; *see also Vernace*, 96 NY2d at 888 [17-year delay in murder case was "extensive" but "other factors favor the prosecution"]).  The majority ignores this line of case law, instead making the inappropriate comparison between the delay here and that in *Staley*, where the defendant was convicted of unauthorized use of a vehicle (majority op at 8-9).

Importantly, even had the legislature not repealed the statute of limitations for first-degree rape, this prosecution would have fallen within the pre-amendment five-year statute of limitations (*see People v Velez*, 22 NY3d 970, 972 [2013] ["the charges against defendant were filed within the statute of limitations period and no special circumstances exist impairing his right to a fair trial"]). Thus, while the delay is significant and favors defendant, it is nowhere near so long as to manifestly deprive defendant of his due process rights.[9]

***Reason for the delay*:** The People lack a credible justification for the 31-month delay in seeking a search warrant for defendant's DNA. But there is no evidence that their actions, or lack thereof, were taken in bad faith toward defendant, with the aim of prejudicing his ability to defend himself.[10] While good faith generally immunizes a case from dismissal based on pre-accusatory instrument delay, the absence of good faith does not, in and of itself, require dismissal (*see Wiggins*, 31 NY3d at 13). In other words, due process tolerates (1) indefinite, good-faith preindictment delay (*see id.*; *People v Singer*, 44 NY2d 241, 254 [1978]), (2) some, but not indefinite delay attributable neither to the

---

[9] Indeed, the trial court erroneously believed that the five-year statute of limitations for first-degree rape prosecutions was in place at the time of defendant's prosecution and nevertheless determined that, upon balancing the *Taranovich* factors, including "that complainant was physically helpless and incapable of consent" and "the absence of any demonstrated prejudice," the delay here did not violate defendant's due process rights. The Appellate Division, in affirming defendant's conviction, did not correct the court's error.

[10] In characterizing the dissent as suggesting that law enforcement's actions or attitudes toward the victim do not constitute bad faith, the majority confuses the bad faith analysis (majority op at 13). Law enforcement's mistreatment of an innocent victim, or even bad faith toward a victim, does not constitute bad faith toward a defendant.

People's good or bad faith (*see Fuller*, 57 NY2d at 159 ["unexplained and unreasonable delay in commencing a prosecution *may* constitute a denial of due process"]; *Doggett v United States*, 505 US 647, 656-657 [1992] ["Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground"]; *Barker*, 407 US at 531 ["A deliberate attempt to delay the trial in order to hamper the defendant should be weighted heavily against the government. A more neutral reason such as negligence . . . should be weighted less heavily"]), and (3) little to no delay resulting from the People's bad faith, such as an attempt to gain a tactical advantage over the defendant by delaying a prosecution.

"The relevance of the People's good faith" is greater for preindictment than postindictment delay, such that a longer delay will be tolerated (*Wiggins*, 31 NY3d at 12). Necessarily then, that law enforcement proceeded with no bad faith must also mean more in the preindictment context, particularly where there has been no showing of prejudice (*see Doggett*, 505 US at 657 ["to warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice"]). After all, following a lengthy preindictment delay that was not occasioned by good cause, a defendant only "may be entitled to dismissal" where there is "no showing of special prejudice" after a proper balancing of all factors (*Singer*, 44 NY2d at 254). In *Singer*, the Court emphasized consideration of the People's possible bad faith in delaying prosecution (as the dissent recognized [*id.* at 257-258] [Gabrielli, J., dissenting]), appreciating its critical importance in light of defendant's lack of actual prejudice, and opined that the defendant's due process rights might have been violated

because these other factors tipped the balance in the defendant's favor (*id.* at 254-255). Indeed, the Court remitted the case for a hearing on this issue alone. But in suggesting that a defendant must never show actual prejudice, even when there is no bad faith, the majority turns speedy trial precedent on its head.[11] Because defendant can establish little to no actual prejudice here, the People's lack of bad faith dilutes the significance of this factor, especially in light of the seriousness of the crime.

Though this factor weighs in defendant's favor, it does not have the determinative significance that the majority ascribes to it. In the context of one of our society's gravest crimes, where defendant "rel[ies] solely on the real possibility of prejudice inherent in any extended delay" (*Marion*, 404 US at 325-326), it cannot be the end of the discussion. As this Court recently reiterated, "[t]he *Taranovich* framework is a holistic one" (*People v Johnson*, 39 NY3d 92, 96 [2022]). Yet the majority prioritizes this factor above the others, dismissing the case ostensibly to teach law enforcement a lesson and thereby substituting the exclusionary rule's goal of "deter[ring] improper conduct on the part of law enforcement officials" (*People v Logan*, 25 NY2d 184, 193 [1969]) for *Taranovich* balancing.

And while we cannot say for certain whether the delay was specifically attributable to investigators' disbelief of A.L.'s account of the incident, or their apathy toward her trauma, undoubtedly the delay was a product of enduring cultural attitudes toward sexual

---

[11] Of course, a defendant does not carry the burden of demonstrating a lack of good cause for the delay (*see* majority op at 12-13). But while the People here might not be able to justify the delay, they have certainly demonstrated a lack of bad faith toward defendant.

violence. Sexual assault victims have traditionally faced skepticism when reporting attacks to law enforcement, due to the deeply entrenched prejudices surrounding sexual assault, including "misconceptions" about consent and false reporting (*Taylor*, 75 NY2d at 288-289). These perspectives have infected both our culture, and law enforcement's handling of these cases, resulting in the premature ending of rape investigations, closing cases as based on "unfounded" allegations, and devoting less time and resources to investigating such cases (*see* Deborah Tuerkheimer, *Incredible Women: Sexual Violence and the Credibility Discount*, 166 U Pa L Rev 1, 31-32 [2017]).

Despite continuing efforts to undo past harms resulting from the debasing treatment of victims of sex crimes, particularly where, as here, the parties are known to each other, the structural barriers that victims confront in pursuing sexual assault prosecutions still persist. Allowing a defendant to benefit from a delay that caused no actual harm to him is incongruous with *Singer*'s aim of balancing a defendant's due process rights with society's interest in processing serious cases and holding perpetrators accountable. Such outcomes are reserved for the most extraordinary of circumstances and are so sporadic that this Court has never—until today—dismissed an accusatory instrument based solely on the length of the delay (*see Taranovich*, 37 NY2d at 445 ["this court has steadfastly refused to set forth a per se period beyond which a criminal prosecution may not be pursued"]). In doing so, the majority imposes a de facto 31-month limitation on first-degree rape investigations.

In creating a rule that will systemically bar countless victims from obtaining justice in the event law enforcement fails "to recognize the seriousness of sexual assault," (majority op at 17), the majority has only reaffirmed rape culture's pernicious grasp on our

criminal justice system. Its opinion will not deter this type of behavior by law enforcement, but instead be weaponized against victims and used in hindsight to rationalize closing long-running rape investigations and dismissing prosecutions. The majority, dubiously asserting that reversing the rape conviction here will benefit future rape victims and the public (majority op at 19), fails to appreciate the practical implications of the precedent that they are creating: if law enforcement negligently delays rape investigations, women's voices will continue to be stifled, rapists held unaccountable, and jury verdicts discarded. It is difficult to comprehend how that result protects victims or our communities. Moreover, it is no comfort to this victim to hear the old refrain that next time it will be different; next time, your voice will be heard.

Using the long-standing sensitive balancing test as required by our precedent, due process does not require the drastic remedy of dismissing this case. Where the crime is of the utmost severity, defendant was not incarcerated, there was no public accusation, and defendant has shown no actual prejudice from the delay, dismissal of the accusatory instrument is unwarranted. The legislature's clear assertion of the strong societal interest in prosecuting rape cases, compounded with the heightened importance of rape victims having their day in court, cannot be undervalued in our balancing analysis. Overzealous dismissal of accusatory instruments for the delay in bringing those instruments improperly infringes on the public interest in bringing accused persons to trial (*cf. United States v Ewell*, 383 US 116, 121 [1966]), particularly where those crimes present the most consequential, heinous threats to the safety and health of our society. Despite much

progress, and a cultural reckoning surrounding sexual violence and power dynamics, it is clear from today's decision that there is much work to be done.

Because defendant's remaining contentions also lack merit, I would affirm the Appellate Division order.

Order reversed and indictment dismissed. Opinion by Judge Wilson. Acting Chief Judge Cannataro and Judges Rivera and Troutman concur. Judge Garcia dissents for the reasons stated in so much of the majority opinion of Justice Christine M. Clark at the Appellate Division that upheld the denial of the motion to dismiss the indictment on constitutional speedy trial grounds (*see* 196 AD3d 735, 737 [3d Dept 2021]). Judge Singas dissents and votes to affirm in an opinion.

Decided March 16, 2023